# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GLENN H. STEPHENS III, Ph.D. J.D.<br>*Pro Se Plaintiff* | ) ) ) | |
| DINGO STEPHENS, a Chihauhau,<br>by his Next Friend Glenn Stephens,<br>*Plaintiff* | ) ) ) ) | Civil Case No. 3:25-cv-0037<br>337 |
| GLENN STEPHENS, JOHN DOES,<br>*Class Plaintiffs,*<br>v. | ) ) ) ) ) | |
| DENISE DIETER, *et al.*<br>*Defendants.* | ) ) ) ) | Hon. Malachy E. Mannion |

FILED
SCRANTON

JUL 1 0 2025

PER___DJ___
DEPUTY CLERK

## COMPLAINT

## I. Executive Summary

As a result of their systematic disregard of their oaths of offices, legal and judicial

ethics, well-settled law, and the Constitution by Lycoming County[1] Judges, MDJs,

prosecutors and Prison, this case, which began as a challenge to disproportionate bails in

violationof the Privileges & Immunities Clauses has morphed into a Constitutional

retaliation and abuse of process case involving cruel or unusual punishment.

---

[1] The term "County" in this context is solely geographical - the institutions in question are subdivisions of the Commonwealth and for that reason *Aldinger v. Howard*, 427 U.S. 1 (1976)(holding counties are not persons under Section 1983) does not apply.

## II.    Contextualizing This 8th Amendment and Privileges & Immunities Clause Case Against the Backdrop of Plaintiffs' Other Causes of Action

To assist the Court, Plaintiff provides the forest that serves as the context for the "trees" of this case. Plaintiff, a candidate for MDJ in District 29-1-02, a graduate of the University of California Berkeley, School of Law, was until last Fall on a hiatus from law. When forced back into the fray by his arrest without probable cause, Stephens warned opposing parties that if they refused to settle, that litigation would result. The Defendants and others refused.

Forced to litigate what he preferred to settle, Plaintiff exhausted administrative remedies at HUD in his ADA and Fair Housing Act case against Brian Regan et al., in September, 2024; sued in Woming District Court under ADA/FHA and Section 1983 in November 2024;  and removed the instant criminal case to that federal court on or about December 5, 2024. In the interim, despite the fact that MDJ Denise Dieter's small two- or three-layer law firm Drier and Dieter represented Brian Regan previously, Dieter unethically failed to recuse herself from Plaintiff's October 29th preliminary hearing.

Because, under the doctrine of necessity, Stephens could not drive safely to that hearing (his right-front wheel bearing detached), he timely mailed his waiver. See *Bureau of Driver Licensing v. Grasse*, 146 Pa. Comm. 17 (PA 1991)("Under the mailbox rule, proof of mailing raise a rebuttable presumption that the mailed item was received.")[2]

Ignoring the mailbox rule, MDJ Dieter deemed Stephens a non-show and issued a bench warrant. That bench warrant was rendered a nullity when Plaintiff later

---

[2] That MDJ Dieter knows defendants may waive preliminary hearings is public record. On February 24, Brittney Buck waived her preliminary hearing in a case before Dieter.

removed. See *Johnson v. Mississippi*, 421 US 212 (1978)(holding "removal of a state criminal prosecution is extremely narrow . . . but not if removal in a case arising under a federal law providing for specific rights); *Bioconverge LLC v. Attawala*, 2019 US District Lexis 18377621 (2018)(finding removal immediately divests the state court of jurisdiction); *Vigil v. More Independent Suppliers*, 841 F. Supp. 1238 (D.N.M. 2012)(quashing state court notice of non-jury trial).

Ignoring Stephens' timely waiver, Common Pleas Judge Butts and Dieter then finalized the bench warrant for Stephens arrest on October 31, 2024. That quick turnover is suspicious given the fact that Dieter took a week to issue a bench warrant when John Coyle failed to show for a preliminary hearing on February 24, 2025.

Upon removal, the bench warrant became a nullity. But ignoring well-established law, Butts, Dieter, et al., proceed ultra vires. See *Harman v. Cadmus*, 2014 US District Court Lexis 13517 (ED Pa. 2014)("For a court to pronounce on a matter when it has no jurisdiction, is the very definition of ultra vires."); *Gonzales v. Crosby*, 545 US 524, 535 (2005)(If a court lacks jurisdiction, ANY action it takes is ultra vires and void.")

After removal in December, Stephens resumed his Constitutionally-protected criticisms of Butts, et al. on social media. In January, Butts or someone acting on her behalf used that free speech as a pretext to have Stephens wrongly arrested by falsely telling Federal Marshals that Stephens was trying to intimidate judges (a claim the Marshal who arrested Stephens admitted, to Stephens' sister was "BS.") Stephens surrendered peacefully but objected. See *Commonwealth v. Gilman*, 485 PA 145 (1979)(holding "voluntary surrender to authorities of a state [court] which has no jurisdiction to try an individual for a crime will not cure the state's lack of jurisdiction.)

The unlawful seizure was the quintessence of abuse of process. See *Mayer v. Walter*, 64 PA 283 (Feb. 28, 1879)("An abuse is where the party employs it for some unlawful object, not the purpose which it is intended by the law to effect; in other words, a perversion of it.") The Defendants' abuse of process criminalized Stephens' Constitutional free speech and conduct and his statuorily protected ADA/FHA activity (opposition, participation, and suit filing). See *Netter v. Barnes*, 908 F 3d 932 (4th Cir. 2018)(holding that "criminalizing an EEOC charge or pursuing a Title VII suit would undoubtedly be preempted as an obstacle to the enforcement" [of the Federal statute]."[3]

Wrongly seized and imprisoned, despite the futility of his habeas corpus appeals, Stephens exhausted administrative remedies and recently petitioned for habeas relief.

---

[3] In addition to preemption under *Netter*, this matter falls under one of the exceptions to *Younger* deferral or abstention - See Rachel Danner, *Younger Abstention Need Not Keep Federal Courts from Hearing Bail Reform Cases*, Georgetown Journal of Poverty Law and Policy, (March 18, 2024)(arguing that under *Younger v. Harris*, 401 U.S. 37, 44 (1971) as construed in light of the Supreme Court's decision by *Sprint Communications, v. Jacobs*, 571 U.S. 69 (2013) that while "abstention from the exercise of federal jurisdiction is the 'exception, not the rule,'" at least in the context of bail litigation, that, in instances like this, where the state prosecution is engaged in bad faith or harassment, *id* at 50, that Younger deferral does not apply"    see https://www.law.georgetown.edu/poverty-journal/blog/younger-abstention-need-not-keep-federal-courts-from-hearing-bail-reform-cases/ (last visited July 7, 2025); Alezeh Rauf, *Abstaining from Abstention: Why Younger Abstention Does Not Apply in Bail 42 USC § 1983 Bail Litigation* 171 U. Pa. L. Rev. 535 (2023). In addition, because the Judges and MDJs in question are biased and have a financial interests in the outcome of these matters, that the "biased and unable to be trusted" exception to Younger deferral also applies, see *Gibson v. Berryhill*, US 564 (1973)(carving out an exception to deferral and providing for federa jurisdiction in cases in which the state court or administrative entity is so "biased by prejudgment and pecuniary interest that it could not constitutionally conduct hearings." *Gibson* is right on point here.

4

## III.    The Privileges and Immunities Clause

Although relegated to the dustbin of history, this clause manifests the Founding Fathers' concern that the Constitution they were expounding[5] would create a single federal government in which the privileges, immunities, and rights would be enjoyed by all. Prior to the Constitution, the privileges, immunities, and rights enjoyed were a patchwork, whether differences between the thirteen colonies or the various confederated former colonies.

The Founders' concern for "equity for all" under the new Constitution finds expression not only in the Privileges and Immunities Clause but also in Commerce Clauses, the diversity

---

[4]    Exhaustion is one of the prerequisites for habeas corpus relief. Ten days after he was illegally seized in violation of the Fourth Amendment, Plaintiff filed the first of a number of administrative appeals with the Prison, see *Ford v. Warden*, 2025 U.S. District Lexis 28908 (MD PA, February 19, 2025)(finding informal requests and filed via an internal prison system suffice for purposes of exhaustion), requesting his immediate release, citing the voiding of the October arrest warrant upon removal. January 20, 2025, Request #524343201. He reiterated this request on February 20th (#533720911), February 21st (#534083851), February 25th (#535341041), February 27th (#535864701), February 28 (#53635001), March 6 (#538402961) and March 7 (#538710211, #538402961, #538719521, #538714581). It was obvious that these appeals and similar challenges to the ultra vires conduct of Common Pleas Judges and MDJs were futile. See *Roser v. Lundy*, 455 US 509, 516 n. 7 (2015)(finding exhaustion is likewise not required when it would be futile); *Wilson v. Mum, Inc.* 475 F.3d 166, 175 (3d. Cir. 2007)("In order to invoke the futility exception a party must provide a clear and positive showing of futility.") Here, the plaintiff meets that clear and positive showing standard for futility. See also, *Callwaood v. Enos,* 230 F. 3d. 627, 631 (3d. 2000)(holding no explicit statutory exhaustion requirement applies); *Moscato v. Federal Bureau of Prisons*, 98 F. 3d 761 (3d 1996)("Exhaustion allow the relevant agency to develop a factual record and apply expertise.)

[5]    To use the phrase Supreme Court Chief Justice John Marshall used later in *McMcCulloch v. Maryland*, 17 U.S. 316 (1819).

jurisdiction clause of Article III, and clauses creating a single national postal system, a uniform system of weights and measures, and one system of currency regulation.

In the case of currency, the Framers gave Congress the powers "to coin money" and "regulate the value thereof," powers which have been broadly construed by courts to authorize regulation of every phase of the subject of currency by Congress. Judge Joseph Story's commentary explains how the Constitution fixed defects on the Articles:

> Under the confederation, the continental congress had delegated to them, "the sole and exclusive right and power of regulating the alloy and value of coin struck by their own authority, or by that of the states," and "fixing the standard of weights and measures throughout the United States." It is observable, that, under the confederation, there was no power given to regulate the value of foreign coin, an omission, which in a great measure would destroy any uniformity in the value of the current coin, since the respective states might, by different regulations, create a different value in each. ***The constitution has, with great propriety, cured this defect;*** See Joseph Story, *Commentaries on the Constitution* 3:§§ 1112--17 at https://press-pubs.uchicago.edu/founders/documents/a1_8_5s10.html last visited June 26, 2025. [Emphasis added]

Whether in Commerce or the currency or the Privileges and Immunities Clause, the Framers sought to replace 13 or more ways of doing things with one unified system.

Historically, the state's police power, both generally and in law enforcement, was the source of diversity. But over time, particularly after the progressive incorporation of the Bill of Rights to the states under the 14th Amendment, criminal due process has been federalized. Thus, the Privileges and Immunities clause applies to criminal matters.

## IV. Factual Background

### a. "Localism" Best Describes the County's Xenophobia

Because nativism and xenophobia have reached pandemic proportions in our de

facto electoral monarchy, another term is needed to capture the institutional and non-institutional animus for outsiders that pervades the social and legal landscape of Lycoming County Pennsylvania. Once one of the richest places in the United States, due to a millionaire-creating logging boom that was decimated by an epic Gilded-Era flood, Williamsport now has a per capita income of just $14,000 a year. Although the Scylla and Charybdis of deindustrialization and de-unionization played a role in the City's decline, abysmally poor government mismanagement by Mayors, City Councils and County Commissioners made matters worse.

Although the area is a geographical hub, sitting at the crossroads of 220 running East and West and 11/15 running North and South, a series of catastrophic decisions by government officials turned the area into a hotbed of xenophobic and nativism and "localism."

As anyone who has lived near a beach knows, localism is the phrase that surfers use to express "Not on Our Beach." Surfers all know that showing up to surf on someone else's beach can lead to fisticuffs, or worse. A imilar disdain for non-locals saturates LyCo  law enforcement and courts as a result of backlash to the  use of "local beaches" by outsiders called "the influx."

**b.  The Rise of LyCo Localism in Response to the "Influx"**

In the 1990s, bad City and County government, which has already turned Williamsport into, to use President Trump's term, a "shithole," made the catastrophic decision to accept federal and state block grants to fund the creation and maintenance of drug treatment facilities. While this calamity brought in revenues short term, the long term impact was disastrous.

Seemingly overnight, a City with relatively low crime and drug rates was deluged by a drug epidemic and related crime spree as drug addicts, largely black or Latino, from bigger Pennsylvania cities like Harrisburg and Philadelphia flooded the area. Predictably skyrocketing drug and crime created a ghetto within a shithole, in the area then known as "Erie Avenue." "Erie Avenue" became a kind of racist code word for an area populated, in the racist imagination, by welfare-dependent, drug-using, crime committing, single-parent-family blacks.

But the real Scarlet Letter or Yellow Star of unwanted outsiders for localist Lycoming County and Williamsport residents was the term "influx." For many locals, including but not limited to racists, the term "influx" conveyed(s) and connoted(s) much the same mix of fury, disgust, contempt, scorn and marginalization that "illegals" has for portions of the MAGA movement and the sections of Trump base. Whether the Lycoming County "I" word - "Influx" - or the contemporary political scene's "I" word - "Illegals" - these xenophobic and nativists terms express not only opprobrium but also signal to the unwanted outsiders that the locals seek to convey in no uncertain terms that outsiders should not, metaphorically, try to surf on the local's beach and that if outsiders do "surf our beach," that punishments will be doled out.

If Lycoming County localism was limited to snide comments, snark and "dis"-ing of outsiders, then it would simply be a matter of poor manners and bad etiquette. But Lycoming County Localism pervades and distorts the area's criminal justice system.

### c. Lycoming County Weaponizes the War on the Influx

It is said that for every reaction there is a reaction. If initially, exploding crime rates and drug use caught local law enforcement and the judiciary with their pants

down, over time the City and County weaponized their response, particularly with the creation of the so-called NEU (Narcotics Enforcement Unit) which not, like ICE, acts without any semblance of regard for the Constitution, particularly in the area of criminal due process. For example, the arrested are almost never Mirandized, the fruits of the poison tree are seldom excluded and "niceties" like notice, a speedy trial, and representation by competent are generally ignored in LyCo.

Ironically, far from deterring drug trafficking, this systemic perversion of justice allows the bigger fish to escape (because they can afford zealous representation from outside the County) while netting small fry on petty drug crimes. As a result, drug use and crime haven't declines because the major players aren't the perps found in the County Prison. For example, a local marijuana king-pin with social and political connections to County Commissioner Mussere, represented by white-shoe Philadelphia criminal lawyers recently posted an amount satisfying a half million dollars bail, while inmates who have awaited trial for several years [sic] for petty drug crimes sit in prison because their families cannot post a thousand or two in bail.

### e. Head Common Judge Butts Makes the LCP a Cottage Industry

Ironically, the City and County's foray into drug treatment devolved into a war on drugs. But the NEU's unbounded ICE-style assault on the Constitution is only part of this saga. The conversion of the area's drug treatment system into a war on drugs (albeit mostly petty drug and drug-related petty crime like shop-lifting or petty theft) into a cottage industry.

Like the prisons most would associate with movies like Brubaker or The Shawshank Redemption, the Lycoming County Prison (LCP) is a money making

enterprise for Head Common Pleas Judges Butts, who owns stock in the LCP. In a clear conflict of interest, Head Judge Butts supervises both Common Pleas Judges (Carlucci, Tira, Gardner) and MDJs (Dieter, Biichle, Frey) who sentence the accused to that prison. (To the knowledge of the Plaintiff only MDJs William Solomon and Gary Whiteman seem to opt out of this grift). This conflict of interest not only generally excessive bails meted out by the LyCo justice system (albeit not as excessive as the non-local Plaintiff's ridiculously excessive bail) but also unhealthy condition of the LCP.

## V. *Twombly Isbal* Averments

Although, as a policy matter, the Plaintiff argues that Conley-style notice pleading should suffice, he avers the following facts under *Bell Atlantic v. Twombly*, 550 US 544, 555 (2000)("A court must accept the factual allegations of a complaint as true . . . all reasonable inferences that can be drawn from them after construing them in the light most favorable" to party." see also *Ashcraft v. Iqbal*, 556 US 678 (2009)("Threadbare recitals of the elements of a cause of action supported by mere conclusory statements do not suffice."). Under Twombly, the Plaintiff's "factual allegations [suffice] . . . to rise above the speculative level." Id. at 55. Citing *Iqbal*, in Wilson v. N.J. State Parole Board, 20120 US District Lexis 14497, * 8 (Dist. NJ. 2010) a Middle District Court prescribed:

> Therefoer, after Iqbal . . . two part analysis. First, the factual and legal elements of a claim must be separated. The District Court MUST accept all the complaints' . . . facts as true, but may disregard any legal conclusions. Second, the District Court must determine whether the facts alleged in the complaint are sufficient to show the plaintiff has a plausible claim for relief . . . This plausibility determination will be a context specific task that requires the reviewing court to draw on its . . . experience and common sense. Citing *Fowler v. UMPC Shadyside*, 578 F. 3d 203, 210 -

211 (3d Cir. 2009.

Consistent with the above cited law, Plaintiff avers the following facts - but notes instances in which the proposition in question is arguably mixes law and fact or arguably legal, conclusory or argumentative.   Legal, conclusory or argumentative propositions are included to assist the Court's plausibility analysis and determination:

1. In the post-bellum era, Williamsport Pennsylvania was one of the richest cities in the United States due to logging boom.

2. It is said that the City referred to by younger people as "the Port" but called "Billtown" by older people had more millionaires per capita than any other city in the US.

3. As a result, the Williamsport High School's teams are called "Millionaires" to this day.

4. The Great Flood of 1887 destroyed the logging industry and began the City's decline.

5. Although deindustrialization, brain drain, capital flight and the decline of unions played important roles, government mismanagement plays an important role in the City's decline.

6. Williamsport now has a per capita income of $14,000.

7. In the '90s to bring in revenues, the City and Lycoming County accepted state and federal block grants to create residential treatment facilities for drug addicts.

8. Since drug addiction was relatively low in the area, the creation of these drug treatment facilities led to what came to be called "an influx" of drug addicts or former drug addicts and their families from urban areas like Philadelphia and Harrisburg.

9. Because those coming to the area for these reasons were largely black and poor (Williamsport had a small black population prior to the influx), the term "influx" over time came to be code for black, poor, drug addicted, and welfare recipients.

10. This code coincided with the attack on what he called "the culture of welfare" by

Newt Gingrich (who lived downriver in Halifax PA as a child).

11. But the real source of animus locally toward "the influx" was skyrocketing crime rates.

12. In the wake of the influx, crime rose by, to Plaintiff's recollection, 600-700% per year.

13. In an area where people didn't lock their homes and left their vehicles running with the keys in when they ran into a minimart or service station, this explosion of crime was both eye-opening and, for some, traumatizing.

14. Plaintiff's mother, who lived in Woolrich PA (of Woolrich Woolen good fame) and later in the better-off suburb of Williamsport - Loyalsock - used to listen to the police scanners as entertainment and recounted the crime spree to Plaintiff and his sister (a former juvenile probation officer in Montgomery County PA).

15. Although some or even most of the influx "got clean" and went on to lead productive lives and raise families, stereotypes die hard, and the influx, and the ghetto associated with it along Erie Avenue, came to be associated with black, drug addicts or former addicts, criminals, and welfare dependency.

16. So much so that eventually Erie Avenue was renamed Martin Luther King Boulevard to avoid the negative connotations of the former name.

17. But government low income housing remains in that area.

18. And the area West of Brandon park, around Luisa Street and south of UMPC, over to Bowman Field, the minor league baseball stadium remains relatively poor and crime riddled.

19. In contrast the areas on the hills North of High Street and around Grampian along with Loyalsock remain are better off and have less crime.

20. In a sense reversing sequence of the Reagan "war on drugs" of the '80 and the Gingrich "war on welfare dependency and drug addition" of the 90s, as the new

millennium dawned, Williamport began to weaponize a war on drugs and crime.

21. As a result, over time, the only real thriving industry in the area West of Brandon, north of downtown, south of the hills, past the Pajama Factory and west to the Ballfield, aside from UMPC and the baseball team, was the prison.

22. The Lycoming County Prison, although ostensibly run by a prison board and warden, is, in fact run by Head Common Pleas Judge Nancy Butts.

23. Butts reportedly killed her husband - allegedly in self defense.

24. No charges were filed.

25. As Head Judge of Common Pleas, Butts' court and the courts of the Judges and MDJs that she supervises sentence perpetrators to the Prison that Butts runs.

26. Butts owns stock in the prison.

27. As a result, Butts has a direct financial stake in the prison as a profit making enterprise.

28. This creates an incentive for Butts and her judges, but also the local prosecutor, to over-plead cases, negotiate plea bargains with relatively long sentences, slow the time to a speedy trial, and, in case that do not plead, dole out long sentences.

29. Many of the inmates, most of whom are poor, are unrepresented by counsel or if represented by a public defender inadequately represented.

30. In most instances, the public defender assigned to an inmates case never speaks to the inmate until just before their court appearance (for a few minutes with other prisoners present in the pre-court holding cell).

31. As a result, many inmates, particularly those with multiple allegations, are unaware of the matter on which they are to appear and be heard prior to their court date.

32. Since those who make substantial amounts of money distributing drugs or manufacturing drugs (like meth) can afford good lawyers, which they usually hire from Harrisburg or Philly, few "kingpins" sit in the prison.

33. Most of the 600 or so prisoners in the prison are accused of petty drug crimes, drug related property crimes, or collateral matters like failing to pay child support due to addiction and or joblessness.

34. The longer more prisoners stay in the prison, the more money the prison, Butts and Bob Barker Industries, which supplies commissary items, clothing, shoes, etc. make.

35. This then leads to needless dilatory tactics by prosecutors, judges and MDJs, who "delay, delay, delay."

36. Unrepresented or represented by incompetent counsel, many inmates are unaware of their right to speedy trial.

37. As a result, between the dilatory tactics of prosecutors, judges and MDJs happy to permit such tactics, and the inmates lack of awareness of their Constitutional right to a speedy trial in 180 days, many inmates sit in LCP for a year or two prior to trial.

38. Overplead cases, excessive bails, inmate inability to post bail, and the financial and psychological stresses of long prison stays wear down inmates who are innocent or might be found innocent at trial, leading to bad plea bargains.

39. Head Judge Butts and LCP make monies off these long stays and bad plea bargains, not only with grants and subsidies but also through Bob Barker Industries, which supplies the prison.

40. Central to that scheme is the commissary system which allows inmates to purchase food, snacks, medical supplies, clothing, stationary etc. albeit at high prices.

41. For example, a fingernail sized packet of Neosporin costs $1.25.

42. Each week family or friends of the inmate can load as much as $80 in commissary to

an inmate's account.

43. But if the inmate supposedly owes fees or fines then the prison takes 50%.

44. Indigent prisoners - either newly incarcerated inmates who haven't set up or without funded commissary or those who have no funding source after 10 days - are, by Prison regulations, to receive medical supplies they need for free.

45. This policy is regularly violated.

46. Whether indigent or not, inmates are routinely denied or delayed if they request medical supplies and medical help.

47. These delays and denials violate Estelle v. Gramble and the Eight Amendment (legal and conclusory).

48. One such instance, that of Nicolas Edwards closely tracks the Estelle fact pattern.

49. His forearm broken by another prisoner wielding a computer tablet, Nico was denied doctor and medical access for a fortnight.

50. In addition to the agony that entailed (he could not sleep lest he roll on the forearm) Nico, a barber by trade by permanently maimed and disabled.

51. He wears a brace till this day.

52. Plaintiff maintains, as does Nico, that the delay and denial of treatment was retaliation for Nico's jail house lawyering and filing of, inter alia, Section 1983 suits (argumentative arguably).

53. Similarly, a cellie (cell mate) of Plaintiff experienced the delay and short term denial of medical care after he fell from his bunk, hit his head and suffered a subdural hematoma (an injury that killed Plaintiff's grandmother after a fall).

54. Plaintiff and the cellie believe that this delay of care was retribution for his flight

after bailing out.

55. When the cellie later, due to complications from the delayed and denied care, seized, the custodians and a white shirt (a custodial officer) had to crash cart him and take him to the hospital.

56. Retaliation or not, medical treatment and drugs are routinely delayed or denied by the Prison.

57. One dangerous practice of the Prison is cold turkeying newly incarcerated inmates off psychotropic drugs, which are sometimes not represcribed for as much as week.

58. Having studied psyscholanalis since the 1970s, and Medical Law and Law and Psychiatry in Law School, with a P.O. sister, and a friend whose husband committed suicide two days after he was cold-turkeyed off psychotropics, Plaintiff knows well, and will provide Kumho Tires Daubert expert testimony that this practice risks suicidalism, suicide or aggressive behavior. (This statement mixes facts and legal assertions)

59. In Plaintiff's first prison stay, of 19 days, he witnessed one suicide attempt (attempted hanging) caused by this practice.

60. In his second stay, of 60 days, he witnessed a newly incarcerated prisoner who was peaceful after intake (while his meds were still in his system) degenerate into aggressive behavior over the course of 4 or 5 days as the meds left his system.

61. That inmate eventually was escorted by a cordon of C.O.s and a white shirt to solitary confinement after hours of angrily screaming at the door of the block that he was to be "released immediately."

62. In another instance of delayed or denied treatment a block mate of Plaintiff - Carlos or "Los" - was denied asthma meds despite a prescription on file.

63. This led Los to worry about an attack, but his worry made him worry about an anxiety attack (which would trigger asthma attack), both of which caused him to self medicate by exercising outside in cold winter weather.

64. While the exercise burnt off energy and calmed his nerves, the cold air reduced his breathing issues.

65. This self-medication by exercising in the winter outdoors was done without the hat, gloves, coat and boots that inmates who did custodial work received.

66. Denying treatment takes another form in the prison - the imprisonment of the severely mentally ill or mentally incompetent (to stand trial).

67. One block mate of Plaintiff was so deficient cognitively that block mates called him "Caveman."

68. Plaintiff has little doubt the Caveman was unable to participate in his own defense. (Legal and argumentative).

69. But the worst example of a severely mentally ill inmate, arrested and imprisoned over and over, is Santiago.

70. Santiago is homeless and was, for example, arrested for breaking into a church.

71. That was likely for shelter (argumentative).

72. Babbling in tongues and screaming occasionally, Santiago is a threat to himself and others due to his penchant for dipping his hands in toilet water and then using his hands or clothes he dips to clean the sink, his walker and, sometimes, lunch tables.

73. Knowing his hands can pass diseases like hepatitis due to contact with urine or feces, inmates respond to Santiago's attempts to shake hands or fist bump angrily, sometimes with a raised clench fist to express that fisticuffs may ensure if Santiago does not relent.

74. Santiago, as an imminent threat to himself and others is "302" and should be involunatarily committed to a mental health facility.

75. But there, Santiago makes the prison and Butts no money (argumentative).

76. So Santiago ends up in LCP again and again.

77. Ironically (argumentative), Butts received an award for REDUCING the incarceration of the mentally ill.

78. After learning about Santiago, in late Fall 2024, Plaintiff wrote to the entity that gave that award and asked that Butts award be rescinded.

79. Plaintiff believes this Constitutionally protected free speech of asking that the award be taken back, played a role in the wrongful issuance of a bench warrant by Butts on October 31, 2024 along with his wrongful seizure on January 11, 2025. (Legal, conclusory and argumentative but also factual).

80. Perhaps by coincidence (argumentative), when Plaintiff was reincarcerated on January 13, 2025, Santiago just happened to be in the same intake block as Stephens.

81. Plaintiff believes this was done intentionally to signal to Stephens that his protestations regarding Santiago's imprisonment and Stephens attempt to have her award rescinded had failed.

82. Regardless of intent, Santiago is a regular fixture of the LCP.

83. Because the area described above - East of the Ballfield, West of Brandon, north of downtown and Penn College and south of the hills, including the former Erie Avenue - is an area in which the renters' rights, renter related safety and health issues and criminal rights of the mostly poor, many of whom are black, Stephens opted to run for Magisterial District Judge in that area to help fix those problems in August 2023.

84. He has posted signs and given notice of that run to the area's judges, MDJs, law firms and lawyers.

85. His criticism fall under the state's Whistleblower law because the landlords in question received or receive COVID or STEP monies (arguably this is a legal conclusion).

86. Plaintiff rented a space from Brian Regan in the old Lutheran Church at 50 East Houston Street Montgomery PA from May though August 2024.

87. Black mold preceded Stephens in the space.

88. Prior to Stephens residence, there was no dehumidifier in the space.

89. The lack of a dehumidifier did not cause the black mold.

90. The presence of a dehumidifier did not remediate the black mold.

91. Consistent with PA law (a legal statement), Stephens withheld rent for August 2024 and asked for remediation.

92. Harassment and retaliation by Regan and his property manager became almost immediately (Plaintiff submits this is the kind of statement that lay people make as a fact statement that federal courts often misconstrue as law or conclusory,)

93. Plaintiff also asked for the reasonable accommodation of mold remediation.

94. Plaintiff, Regan and Johnson drafted an exit agreement requiring Stephens to move out on Friday August 23, 2024 and to turn in keys to Johnson for $150 in cash from Johnson for utilities and $500 cash from Regan for a hotel room for a week.

95. Johson paid as promised.

96. Regan breached (another statement that Plaintiff submits is both a law and fact statement).

97. Regan paid by check - not cash.

98. The check bounced.

99. Stephens then asked repeatedly for restitution of $500.

100. He also threatened that absent $500 in restitution he would sue for treble damages under the Pennsylvania Unfair Consumer Practice and Trade Practice Law.

101. Such as suit would have totaled $2000.

102. Restitution is a express exception to the state's extortion statute. (Legal but factual)

103. Simultaneously, while asking for restitution, Stephens opposed not only the Regan's ADA/FHAA violations but their unfair business practices and safety and compliance violations.

104. Those communications were deemed criminal extortion and harassment/ stalking by the Detective from the small South Williamsport police force.

105. A source in the DA's office told Plaintiff and his sister, the P.O., that the DA's office views South Williamsport Police investigations as a "dog and pony show."

106. The Detective never spoke to Stephens.

107. His investigation did not investigate the totality of the circumstances, violated common sense, and did not examine the requisite mens rea of Plaintiff. (Legal and argumentative).

108. The crime report of the Regans included voluminous falsehoods (itself a crime) and elided over important background circumstances.

108. His arrest of Stephens lacked probable cause (arguably conclusory).

109. The Regans mentioned that Brian wrote Plaintiff a check but failed to mention the check bounced (itself a crime under Sec. 4105).

110. Stephens is a victim of Regan crimes, not the other way around.

111. The Regan crimes include not only filing a false police report, but also passing bad

commercial paper, fraud and civil and criminal bad business practices (both factual and legal).

112. The Regans failed to mention that at the time they breached Stephens exit agreement by passing a bad check, that they owned over $48,000 in back taxes at more than a half dozen properties that were poised to be sherrif saled absent the payment of taxes.

113. Stephens has no criminal record and had never previously been accused of a crime.

114. Stephens was arrested while lifeguarding at Bucknell University.

115. He lost that job.

116. He lost a job as cross country coach for the combined team of Montgomery and Muncy High Schools.

117. His criminal charges prevent lifeguard work till this day.

118. In the Fall of 2024, he was unable to take a lifeguarding job in Grand Island Nebraska due to these charges.

119. In the Spring of 2025, he was unable to take lifeguarding job in Boyertown PA due to these charges.

120. Like the space Regan rented Stephens, the prison in which was placed after living in black mold for three months, has black mold.

121. Stephens tested papers from his second prison stay and found black mold.

122. In the period between May 2024 and March 11, 2025, Stephens spend 57% of that time in black mold infested space.

123. Stephens never received any notice from August 2024 to present.

124. Stephens was denied Neosporin for an infection on his toe.

125. Stephens was denied the no cost reasonable accommodation of wearing his othotics and running shoes in prison.

126. Stephens was denied paper and envelopes.

127. Stephens traded food for stationary.

128. Stephens' preliminary hearing was moved from September 9, 2024 without notice, explanation or an opportunity to be heard.

129. Stephens truck's front right bearing pulled lose, making his truck unsafe.

130. Stranded in a park outside Grand Island Nebraska on his way back to the preliminary hearing from Denver Colorado (where he filed income tax documents that one must file in person), he rode his bike to a post office to mail is waiver of his preliminary hearing.

131. His mailing on October 29, 2024 satified the mail box rule (arguably conclusory)

132. The MDJ for that hearing, Denise Dieter's law firm represented Regan in the past in a case in which he owed over $6000 to Discover Card.

133. In August, 2024 Regan and his wife owed over $48,000 in back taxes.

134. Dieter failed to recuse.

135. Stephens called the court administrator and the clerk, three calls in all.

136. Stephens also cited the doctrine of necessity.

137. A tow truck driver who towed his truck to a garage opined that Stephens' wheel would have detached and flow from the vehicle if Stephens had driven it.

138. Driving the vehicle risked injury or death to others, Stephens and Dingo on I-80.

139. Dieter ignored the waiver.

140. Dieter deemed Stephens a non-show.

141. Within hours Dieter issue as bench warrant.

142. In a more egregious criminal case discussed above, Dieter waited a week.

143. Butts sealed the warrant two days later.

144. On November 25, 2024 Stephens sued the Regans et al. in Wyoming Federal District Court.

145. Stephens removedthe criminal case on or about December 5, 2024.

146. With that the Lycoming Courts lost jurisdiction (arguably conclusory).

147. Removal quashed the October 31 bench warrant (legal conclusion).

148. No remand motion was filed.

149. Despite losing jurisdiction continued ultra vires, till this day (mix of facts and law).

150. With the loss of jurisdiction and the quashing of the warrant and his bail due to removal, Stephens was free to communicate on social media about the misconduct of Butts and the other MDJs (like Dieter) and problems in the prison system.

151. Stephens exercized that Constitutional right in December after removal.

152. In January, Butts or the DA or an agent lied to US Marshalls claiming Stephens was trying to intimidate judges.

153. This misrepresentation is a classic example of abuse of the legal process to secure an

end external to that process (silencing Stephens and punishing him for his criticism) but Butts et al. (Legal and conclusory, but true).

154. The Marshall told Stephens' sister that he found the allegation her brother was trying to intimidate judges was BS.

155. Because the Marshall was an agent of Defendants and communicated this admission to Stephens sister who functions as his legal secretary (he paid her $65 to do so) that admission is an exception to the hearsay rule (business communication) and a vicarious admission on behalf of Defendants that the seizure was wrongful (Legal, conclusory and argumentative but needed for the court to evaluate facts using its experience and common sense).

156. In another vicarious admission, Plaintiff's eventual public defender admitted that when he worked in the DA's office he recommended the case be dropped )legal and conclusory but needed).

157. Based on "BS" six Marshalls arrested Stephens at a Walmart outside Camp Hill.

158. That seizure was Unconstitutional (conclusory).

159. This mean Stephens spend more time in black mold.

160. In each of Stephens prison stays (19 days in 2024, 60 in 2025) his dog nearly died.

161. When reunited with Stephens he sprang back.

162. Stephens sues to prevent Dingo's death as a true friend (legal statement).

163. Stephens exhausted administrative prison remedies as to his kidnapping and wrongful imprisonment by raising the lack of jurisdiction and the voiding of the October bench warrant a dozen times.

164. He raised the issue in a video appearance with Judge Gardner, but such efforts were futile.

165. Stephens had a second bail hearing with Gardner.

166. Gardner set bail at $25000.

167. Factually, that bail for attempted extortion is much less than nearly 20 bails for local violent crimes many against women.

168. Constitutionally, this disparity violates the privileges and immunities clause (legal and conclusory).

169. Killing Dingo with another prison stay would be cruel and unusual punishment (Plaintiff submits this statement mixes facts and law).

170. Another prison stay for Stephens in mold would violate Estelle and the 8th Amendment - because such a stay would constitute his fourth round of exposure to black mold and the amount of time exposed to such mold and repeated exposures increase the likelihood of illness, the severity of illness and the probability of long term pathologies. (The portion of the sentence prior to the hyphen is legal, argumentative and conclusory but the remainder is fact.)

171. The prison prioritizes profits over prisoner health and safety.

172. Nico Edwards was denied medical treatment for a broken arm for a fortnight.

173. "Los" was denied asthma medication.

174. A cellie of Stephens was denied treatment for a subdural hematoma and nearly died.

175. The Prison cold turkeys new intakes off psychotropic drugs, sometimes not remediating for nearly a weak.

176. That practice leads to suicidalism, aggression and at least one suicide attempt.

177. The Prison should be tested for mold professionally for the health of inmates, guards, and the many staff.

178. Professional black mold tests more sophisticated than the over the counter test Stephens used would show the type of black mold and danger.

179. Plaintiff is entitled to punitive damages because the conduct in question is reprehenisible (conclusory).

180. Plaintiff moves the Court close the prison and order inmates relocated if the professional mold tests warrant.

181. Closed or not, black mold remediation is needed at the prison.

182. Stephens qualifies to be a class representative (conclusory) on behalf of inmates who sought his help earlier and potential future Jane and John Doe class members.

## VII. Analysis of Black Mold and Other Health Risks at LCP

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held the 8th Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency," citing *Jackson v. Bishop*, 404 F.2d 571, 579 (CA8 1968), against which we must evaluate penal measures under "the evolving standards of decency that mark the progress of a maturing society. *Estelle* singled out medical care as one such standard of decency and humanity in this nation's prisons.

> These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death" . . . In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose . . . The infliction of such unnecessary suffering is

inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common law view that "it is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself."  We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment.

The health and safety violations at the LCP are myriad, in large measure because the Judge Butts run prison has a pattern and practice of delaying or denying medical treatment and medications based on the impact on the Butts Barker bottom line Although Plaintiff was in LCP for less than three months, he witnessed a number of a series of horror stories.

First, the prison is saturated with black mold, with mold visible throughout the prison. That the visible black spots and coloring around the prison were black mold was confirmed by tests that Plaintiff conducted with papers he had in prison. See pic. This black mold infestation impacts the health and well being not only of the inmates but also guards and other prison personnel. In the winter, when it was not allergy season, one obese guard was so sick with what appeared to be black mold allergies that he could hardly do his rounds. Although not particularly popular with inmates because of his acerbic manner, his symptoms were so marked that prisoners who might not otherwise do so, wished that he feel better or expressed concern.

Second, LCP unconstitutionally incarcerates severely mentally ill individuals, who should be housed in mental illness treatment facilities. Instead, inmates like Santiago, are imprisoned because their imprisonment helps line the pockets of Butts and Bob Barker. The repeated incarceration of Santiago, a homeless individual with severe mental illness, risks both his health and safety and that of other prisoners. Constantly mumbling to himself in what sound like "tongues," Santiago has a penchant for dipping his hands in toilet water and then using his hands or clothes dipped in that water to "clean." That "cleaning" has included, for

example, the water fountain and spicket/sink area in the outdoor recreation space but also the tables in the intake cell block in which Plaintiff was initially placed on or about January 13, 2025. Because Santiago's toilet water soaked hands or the clothes he uses to clean could give other inmates diseases like hepatitis, when Santiago attempts to shake hands or fist bump other prisoners, for example, in the rec area, his gestures are consistently met with threats and implied violence - like raised fists. Santiago is a danger to himself and others and should be 302ed (put in a mental institution for treatment, not punished for his homelessness).

Third, as a very dangerous pattern and practice, LCP cold turkeys newly interned inmates off psychotropic drugs until the prison medical officer gets around to resuming psychotropic drug prescriptions. Having studied Medical Law at Boalt Hall with Marjorie Shultz (the premier patient-side medical law practitioner in the nation), Law and Psychiatry as a visiting 3L at Georgetown Law Center, and  with a former juvenile PO sister who monitored such meds, Plaintiff knows that cold-turkeying psychotropics creates a dangerous risk of suicide.

In just two short stays in LCP, Plaintiff witnesses two just-incarcerated individuals acting out. One, who was in the weekend intake cell, in which prisoners stay temporarily for 3 days before longer term assignment, with Plaintiff, was subdued and relatively normal at the outset, but due to his being cold turkeyed off med, became more and more aggressive over the course of three days and eventually so aggressive in his demands he "be set free immediately" that he was subdued by a "white shirt" (an officer) and several other custodians. This dangerous situation could have been prevented if this inmates psychotropic meds hadn't been cold turkeyed.

Fourth, another pattern and practice of LCP, driven by the Butts Barker bottom-line, is to delay the transportation of injured or ill prisoners to regular medical facilitates which can diagnoses and treat their maladies. The most ghoulish instance of this consisted of Nicolas

(Nico) Edwards, a barber by trade, being kept in his cell, away from treatment, for two weeks, after another prisoner took a computer tablet and broke Nico's forearm. Plaintiff believes this was done, not only for the usual pecuniary reasons, but also because Nico, a jail house lawyer of considerable zeal, effort and talent, has sued the prison under Section 1983 repeatedly. In this instance, along with greed, the motivation was retribution for Nico's jailhouse lawyering,

In another incident of delayed treatment seemingly in retribution for an failed escape attempt, a cell mate of Plaintiff, was placed in his bunk on two occasions despite complaints of unusual headaches rather than taken to a hospital. In one of those instances, the inmate fell from his bunk, hit his head on the floor, had a subdural hematoma (a injury that killed the Plaintiff's grandmother when untreated in an old age home), but was placed back in bed. When he eventually convulsed, the custodians and a white shirt rushed into his cell with a crash cart and he was finally taken to the hospital he should have been taken to earlier. Like the Nico incident, a combination of greed and spit motivated the delayed treatment.

Fifth, another pattern and practice, not imminently dangerous, but potentially risky, is the denial of low cost preventative care - like giving prisoners Neosporin for cuts and scrapes. Such denials to prisoners without commissary (so called indigent prisoners) violates Prison Handbook prison requiring that indigent prisoners receive medications for free.

For example, because Plaintiff was forced to walk about in cheap Bob Barker Industries shoes after his reasonable accommodation request for his running shoes and orthotics was ignored, he developed an infection on one of his toes where the prison shoes rubbed. He asked, as an indigent without commissary monies, for a small packer of Neosporin - which would have cost LCP $1.25. His request was ignored. Plaintiff believes his requestNeosporin packet was denied in part based on the greed  but also Constitutional-retaliatory reasons - as payback.

The Plaintiff, in his remedies, seeks a writ of mandamus ordering LCP to test for black mold. And if more sophisticated tests so ordered verify that the black mold imperils prisoner and custodian health and safety, that LCP be ordered closed and the prisoners transferred.

## VIII. LyCo Localism in Bails Violates the Privileges and Immunities Clause

One of the pleasures LCP inmates enjoy is reading the daily paper - the Williamsport Sun Gazette. The Sun Gazette, which is very conservative, prints reports of arrests, arraignments and bail amounts. After reading just a few of these crime reports it became abundantly clear to Plaintiff that bails for non-locals were 2-3 times higher for the same or similar crimes by locals.

As a social scientist with years of advanced statistical training, Plaintiff is trained to find evidence that supports the null hypothesis. In this regard, he began reading the crime reports to find evidence of locals receiving the higher bonds for the same crimes as non-locals or the same bond as non-locals who committed more grievous crimes. Put simply, there was, literally, no evidence to support the notion that locals sometimes receive higher bails than nonlocals.

### a) Non-Local Plaintiff's Bail for a Non-Violent Crime was Similar to Numerous Bails for Violent Crimes by Locals - Many of Which Were Against Women

In the Spring, non-local Plaintiff's bail for the non-violent property crime of alleged extortion (for seeking $500 in restitution for a bunced check, an express exemption to the extortion statute and related "harassment" (repeated restitution requests), was set at $25,000. Plaintiff now provides evidence that this $25,000 bail was excessive and violated both the 8th Amendment's prohibition of excessive bails but also the Privileges and Immunities Clause.

#### 1. Local Allegedly Commmittig Violent or Sexual Crimes with Bails Similar or Lower than Plaintiff's

Over course of three months in LCP, Plaintiff collected the following violent

crime details for locals with the same or lower bail than his $25,000 bail amount.

1. Bryon Vance, of 1971 Yale Avenue, punched a woman "in the right side of her head," knocking her out and causing a concussion. Bail was set at $5000.*

2. Thomas Baldwin, of Girock Lane, Jersey Shore, blocked another man's vehicle, jumped on hood, pointed a handgun at him causing the victim to "fear[] for his life. Bail was set at $10,000. [6]

3. While being treated in emergency room, Elizabeth Zinn spat in the face of a security officer, "physically lunged" at another officer and dug "her fingernails into the officer's arm . . . drawing blood." She claimed she was infected with a communicable disease. Bail was set at $15,000.

4. Joel Moser a resident of a medical facility in the County, engaged in inappropriate conduct with a female resident. Bail set at $15,000.

4. James Confer of Almond Street, grabbed woman by the throat, began choking her, slammed her against a wall repeatedly, and forced her to the second floor of house. Bail set at $25,000.

5. During a police pursuit,  Eric Allen Hovak nearly hit an elderly pedestrian and her daughter. To avoid being hit the woman grabbed her daughter and quickly moved into the grass along the road. Traveling at a high rate of speed, he hit a guard rail and multiple vehicles. Charged with reckless endangerment his bail was set at $25,000 (same as Plaintiff).

6. During a domestic dispute, Brittney Buck of Montgomery headbutted a man twice then whipped him with a belt. She damaged his cell phone. MDJ Denise Dieter set bail at $15,000.

7. A Linden man, Michael Willets of the Harvest Moon trailer park, pointed

---

[6] Both of the above stories were found at Philip Holmes, Several Facing Charges in Lycoming County District Courts, Williamsport Sun Gazette, February 24, 2025.

a pellet gun at another. Charged with simple assault and disorderly conduct, his bail was set at $25,000.

8.  City Woman Held for Court in Assault Charges. Jessica Houston Edwin punched another woman several times in the face and arms and kneed the woman in the chest. Bail set at $10,000.

9.  Tyler Shannon of High Street, pulled a knife on a man, then a machete and said "I am going to cut you." Bail set at $25,000.

10.  Ryan Hamilton of Arch Street struck his girlfriend in the stomach, who then called 911 for help. Bail set at $25,000.

11.  During an argument with a pregnant girlfriend a man tried twice to strangle her and placed his hands on her neck and on her nose and mouth, to stop her breathing. Events similar occurred a year ago. $25000.

12. Dwayne Walker 608 Maple shot a handgun outside his home. A bullet was seen on the porch ceiling. Bail set at $5000.

13.  Police responded to a domestic disturbance, finding the girlfriend of Brandon Cohran outside of their apartment. She told police "He tried to kill me . . . multiple times." She had scratches on her neck as well as a black eye. $20,000 bail (less than Plaintiff's)

14. Montoursville Man Allegedly Sent Threatening Texts to a Pizza Delivery Person. The texts said "I'm going to murder you all. Killing myself after that. I'll bash your head in. Shotgun. Pistol." Bail set at $25,000.

15. ShaneDavy. Resisted police, threatening them, "If I want to kill you right now, I will kill you. He also threatened to kill a bar patron. Bail $5000.

16.  Robert James Harper threatened a woman, grabbed and kicked her, saying "I'm going to kill you tonight. I'm going to kill you ____!" He kicked her in the face, bloodied her nose and face. Bail $20,000.

17. Timothy Lewis of 835 1/2 Diamond Street and Daisy Edmonds of Monroe Place allegedly struck one another with a pipe during a disturbance at Lewis' home. Investigation showed Daisy hit Lewis several times on the neck, balk and shoulders with the pipe before he grabbed it and struck her on the elbow. They were arraigned and jailed with bails of $5000 each.

These violent crimes by locals, many against women, several against pregnant women, all resulted in bails equal ro or lower than the non-local Plaintiff's $25,000.

## IX. Privileges & Immunities Inequities and *Estelle* Health Violations Overlap

Because Stephens' means were limited, Judge Gardner knew that setting an excessive bail like $25,000 would ensure he stayed in prison at least two months till he built up enough savings to bail himself out. But when one adds two month exposure to black mold in the LCP to the period from May 2024 to late August 2024, that Stephens and Dingo spent in the black mold infested space that Regan rented him, Stephens spent 172 days or 57% of the  period from May 2024 until March 11, 2025 in surroundings saturated with black mold.

Although Stephens is relatively healthy, he is 67. Black mold poses greater risks for the elderly. See Amanda Demsky, B*lack Mold Symptoms in the Elderly* (July 19, 2022)( "Black mold is a serious problem for people of all ages, but for the elderly—who have a more vulnerable immune system—it could very well be a swift death sentence");

James Merwin, *The Dangerous Long-Term Effects of Mold Exposure in Seniors* (July 1, 2022) ("Mold exposure can have dangerous long-term effects on seniors").

The failure of the Judge-Butts-run prison to test for black mold is particularly glaring in light of a recent article in the Sun Gazette regarding the presence of black mold in Williamsport City Hall. On September 4, 2024, a fortnight after Stephens wrongful imprisonment began the Sun Gazette reported that there were "complaints about mold in the basement." Craig Carter of the BKV consulting firm the City hired was quoted as saying,"The basement was causing some issues. People didn't feel comfortable in the basement or maybe there was mold or some of that causing people some issues. See Mark Maroney, *City Hall Consultants: Mechanical System Costly*, Williamsport Sun Gazette (September 4, 2024).

Plaintiff moves to amend his complaint to include himself and other Jane and John Doe inmates as class plaintiffs for a suit under Estelle for their exposure to black mold, with Plaintiff serving as the representative of the class. Although pro se inmates are not normally permitted to represent fellows "because a lay person ordinarily does not possess the legal training and expertise to protect their interests, see *James v. Carr,* 2011 WL 6965799 n. 1 (W D LA 2011), Stephens is not a lay person, has extensive training including in medical law, and is currently a member in good standing in a Federal Court

- the Eastern District of Michigan. Beyond that, Stephens will represent the class pro bono without any contingency-fee requirement.

## X.  Damages and Relief

In addition to the TRO, injunction and habeas writ sought earlier, Plaintiff moves that the Court issue of writ of mandadmus ordering the LCP to allow a professional firm that tests for black mold of the Court's choosing to test the prison for black mold. In the event that black mold proves dangerous to the health of inmates and custodians and other prison employees, Plaintiff moves the Court order LCP closed until further notice.

Although writs of mandamus are unusual, such writs are essential to keep renegade public institutions like this accountable:

> At its core the [writ of mandamus rests on] the principle that, in a democratic society, there must be accountability for the official and entities who refuse to fulfill their duties as provided by the law . . . [consequently] mandamus damages under Section 8303 [are] narrowly directed to address the failure to perform a public function. MFW Wine Co. LLC v. PA Liquor Control Board, 318 A 3d 100 (2024).

In this instance the failure in question is the Butts-run prison's failure to ensure compliance with the Constitutional prohibition against cruel or unusual punishment

by incarcerating prisoners in a black mold infested and not, to the knowledge of Plaintiff and other prisoners - testing for such mold.

The failure of the Judge Butts at al. to test for black mold is particularly glaring in light of a recent article in the Sun Gazette regarding the presence of black mold in another area government building - Williamsport City Hall ( a few blocks away from the Prison). On September 4, 2024, a fortnight after Stephens wrongful imprisonment began the Sun Gazette reported that there were "complaints about mold in the basement." Craig Carter of the BKV consulting firm the City hired was quoted as saying,"The basement was causing some issues. People didn't feel comfortable in the basement or maybe there was mold or some of that causing people some issues. See Mark Maroney, City Hall Consultants: Mechanical System Costly, Williamsport Sun Gazette (September 4, 2024). In addition, the Courts now know, because Stephens reminded them in filings that Brian Regan was cited for cose violations in the old school near Bowman field (about a mile from the prison), as published by the Sun Gazette, and admitted that building had mold due to a leaking ceiling to the Blight Committe.

So, despite the fact that Williamsport sits along the Susquehanna with a dyke levee on the north side of town and hills like Grampian Hills to the South, and the fact that City Hall and the old school have black mold, the Judge Butts run prison continues

to breach its duties to test the facility. Again, the explanation is two fold. First, such testing might hurt the Butts Barker bottom line. Second, the prison is disparately not only poor and black or Latino, but also disparately non-local - the hated influx.

In the meantime, Plaintiff moves the Court amend the caption to add inmates as a class plaintiff for a suit under Estelle, with Plaintiff serving as class representative. Although pro se inmates are not normally permitted to represent fellows "because a lay person ordinarily does not possess the legal training and expertise to protect their interests, see *James v. Carr*, 2011 WL 6965799 n. 1 (W D LA 2011), Dr. Stephens is not a lay person, has extensive training including in medical law, and is currently a member in good standing in a Federal Court - the Eastern District of Michigan. Beyond that, Stephens will represent the class pro bono without any contingency requirement and apply his considerable experience as an ADR professional and mediator to resolve the class action without litigation. Such resolution, prior to trial, would avoid a scenario in which Dr. Stephens would be the lawyer for a class including himself.

In addition to those class damages, for abuse of process resulting in two months of false imprisonment in a prison infested with black mold and the near death of Dingo twice, Dr. Stephens seeks punitive damages because the Defendants have acted in an outrageous fashion due to the defendant's evil motive. See *Reynolds v. Genteel*, 346 Pa.

Super. 336 (Pa. Sup. 1985)(holding punitive damages apply because the conduct of defendants was "malicious, reckless, willful and oppressive).

The US Supreme Court has erected three guidelines for a punitive damages the most important of which is the reprehensibility of defendants' actions which is the "primary indicator" of the reasonableness of punitive damages. Plaintiff inveighs this Court to hold their conduct reprehensible. *BMW North America Inc. v Gore*, 517 US 559 (1996)(the size of punitive damages must be related to the government's interest in deterrence). Here the Cash for Curs Defendants need to be deterred by this Court.

In this case, the Defendants ignored their oaths, the Constitution, well-settled law (like the mail box rule) and procedural (like Plaintiff's right to waive his preliminary hearing), judicial ethics (Dieter not recusing after her firm represented Regans), acted with suspicious haste ( Dieter promulgated the same day she wrongly deemed Stephens a non-show, but in the case discussed above, involving a local, waited a week), lied to federal marshal's while proceeding ultra vires (pulling that marshall off a human trafficking case, then once Stephens was in their custody imposed an excessive bond what dwarfs that of violent alleged offenders many of who battered women or partners, all for Stephens running for MDJ, criticizing the kleptocracy and exercising federal statutory rights under the ADA and FHAA.

Unmentioned thus far in this Complaint is the fact that Stephens - to the amazement of other prisoners and his sister a former probation officer - never received any noticIne - not a single piece of paper from August through the present. None. In the beginning of the case, the MDJs and Judges claimed this was because Stephens Watsontown PO box was no longer in use. Knowing this was a pretext, Stephens requested, in the Fall and Spring, email copies of notices. None ever materialized.

When Stephens was bailed out in March, he was purported required to live with his sister, so he had a set mailing address for notices. None ever materialized. Stephens then wrote to the Court administrator, asked a third time for notices by mail.

The first failure to provide notice came when Stephens initial preliminary hearing was scheduled on September 9, 2024. Without giving Stephens any opportunity to oppose a scheduling change (he was eager to prove a lack a probably cause ASAP and be released with charge dropped), and without informing Stephens, his prison counselor or the Prison, Stephens sat and waited until 2:30 that afternoon to go to court. He did the same the next day. And the next. No paper or oral notice was ever given.

From the outset of this case, to the extent Stephens knew of a scheduled event it was via his sister shaking the tree or looking online. Stephens' sister, a veteran of three decades as a probation officer in Montgomery County PA, said she had never seen or

heard of anything like it. Stephens very much believes the utter and complete lack of notice was both punitive but also a trap. By not providing Stephens with notice, the odds of him missing a court date skyrocket.

Notice is not a nicety or etiquette. "State actors must provide certain procedural safeguard . . . by which individuals can raise objections to a deprivation of their Constitutionally protected . . .interests. The right to notice and a meaningful opportunity to be heard, constitute the minimum due process requirements in all circumstances where the state acts to deprive an individual of liberty or property." see *Washington v. PA Dept. of Corrections*, 306 A 3d 263 (2023); see also LaChancer v.Erikson,522 US 262, 266 (1998)("The core of Due Process is the right of Notice and an meaningful opportunity to be heard." ) Stephens never got this right.

In his first two weeks or so of incarceration, Plaintiff was denied notice and the opportunity to be heard TWICE. First, without a hearing, notice, or explanation, Butts moved Stephens case from MDJ Solomon to Common Pleas. As always, Stephens learned of this from his sister, the former PO. Shaking the institutional grapevine, she learned this was done because Butts et al. found a 2023 Facebook page post from Stephens praising MDJ Solomon. The court administrative person with whom Plaintiff's sister spoke, told his sister, that she [the court administrative person] had

never heard of "anything like this." Stephens case was moved because Butts could not have Stephens getting a trial by a fair MDJ applying law to facts. By transferring the case to Common Pleas Judges beholden to her, so she could rig outcomes.

Abuse of process of this type - personalized to punish a particular individual - violates the Constitution's express provisions but also its spirit. Plaintiff respectfully reminds the Court that modern constitutionalism, particularly Anglo-American, has an one of its two main foundations - the other being that no individual is ABOVE the law - that no individual falls outside the law. This equitable principle is the reason the Star Chamber was abolished in England and the reason the Constitution prohibits bills of attainder. Our legal system is not there for tribal retribution. But in the case of Stephens, that is precisely what Butts, Dieter, Gardner, Tira et al. sought. To get Stephens back.

Having moved Stephens venue unConstitutionally, a week or so later, without explanation, notice, or the opportunity to be heard, Stephens preliminary hearing was delayed almost two months until October 29. The reason for this delay is simple. Knowing Stephens was a lawyer, with no criminal history and 66 years old, Butts sought to punish Stephens for bucking the system and running against Biichle with as long a tour in prison as possible. That no reason was given lays the foundation for the adverse inference (Plaintiff so moves) by this Court that there was no good reason for the delay.

Given that their conduct is reprehensible, the question then is the amount of punitive damages. The amount of punitive damages is generally proportional to compensatory damages, which the PA Supreme Court recently held can be over 11 to 1., supra, see also *BMW*, id; *Pacific Mutual Life v. Haslip*, 499 US 1 (1999)(upholding $10,000,000 in punitives in $19,000 compensatory case).This then raises the issue of what compensatory damages apply for wrongful imprisonment.

This case - deemed *Cash for Curs* by Plaintiff - resembles the *Cash for Kids* scandal of Luzerne County, albeit in this case the corruption and abuse of the process is broadly institutional, with all but two rather than two Judges or MDJs taking part.  In Wallace v. Powell, 2022 U.S. Dist. LEXIS 146700 (M.D. Pa.), a court of the Middle District of PA found the "[p]laintiffs are the tragic human casualties of a scandal of epic proportion and awarded compensatory damages of $1,000 per day for each day of wrongful detention."  Given the number of plaintiffs, compensatory damages totaled $106.3 million to which another $100 million in punitive damages was added.See Ashlaigh Dye, Former Judges in Pennsylvania 'Kids for Cash' Scandal Must Pay $206 Million in Damages, Prison Legal News (February, 2023) at https://www.prisonlegalnews.org/news/2023/feb/1/former-judges-pennsylvania-kids-cash-scandal-must-pay-206-million-damages/ (last visited July 5, 2025).

This case involves a single Plaintiff, who was wrongly imprisoner for 79 days, which would amount to $79,000 in compensatory damages at the *Wallace v. Powell* rate. But unlike that case, punitive damages of slightly less than a 1:1 ratio to compensatory damages will not deter the Defendants. Therefore, consistent with the upper threshold of that ration which the Pennsylvania Supreme Court set in *Bert Co. v. Turk*, 298 A.3d 44, 48 (Pa. 2023) of an 11:1 ratio of compensatory to punitive damages Plaintiff seeks $869,000 in punitive damages all of which he shall assign to charity.

Respectfully,

// Glenn H. Stephens *III*
Glenn H. Stephens III, Ph.D. J.D.
205 Berkshire Drive
Douglassville PA 19518
Drghs3@gmail.com
570-204-7837

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing was mailed to the Court and served on Defendants on this 6th day of July, 2025.

*// Glenn H. Stephens III Ph.D. J.D.*

Mistakes may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023. All rights reserved.

**PRIORITY MAIL**
**FLAT RATE ENVELOPE**
**POSTAGE REQUIRED**

**USPS X-PAY**

PRESS FIRMLY TO SEAL

FROM:

Glenn Stephens
c/o Anthony Stevenson
20 S Berkshire Drive
Douglassville PA
19518

RECEIVED
SCRANTON
JUL 10 2025
DEPUTY CLERK

TO:

Pro Se Indigent Inmate Clerk
US District Court
PO Box 1148
Scranton PA
18501-1148

**PRIORITY MAIL**
**Retail**

**P**

US POSTAGE PAID
$10.10

Origin: 19464
07/07/25
4167810863-51

**PRIORITY MAIL®**

0 Lb 12.80 oz

RDC 03

B099

EXPECTED DELIVERY DAY: 07/10/25

SHIP
TO:
PO BOX 1148
SCRANTON PA 18501-1148

USPS TRACKING® #

9505 5156 4186 5188 4617 12

how2recycle.info

USPS.COM/PICKUP

This package is made from post-consumer waste. Please recycle - again.